# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00591-CR

---

**Ronald Boatright, Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE 21ST DISTRICT COURT OF BASTROP COUNTY**
**NO. 16,789, THE HONORABLE REVA TOWSLEE CORBETT, JUDGE PRESIDING**

---

### M E M O R A N D U M   O P I N I O N

A jury convicted appellant Ronald Boatright of murder and assessed punishment at 45 years' imprisonment. The district court rendered judgment on the verdict. In a single issue on appeal, Boatright asserts that the evidence is insufficient to support the jury's implicit rejection of his claim that he acted in self-defense. We will affirm the district court's judgment.

### BACKGROUND

The jury heard evidence that on February 13, 2019, Boatright shot and killed his 21-year-old stepson, Toby Darst, at their home in Cedar Creek. Nancy McAdams, who is Boatright's wife and Darst's mother, witnessed the shooting and testified at trial. McAdams testified that Boatright was drunk that day and had been "antagonizing" Darst by "cutting off" the internet while Darst was trying to play video games in his bedroom. McAdams, sensing the "tension" between the two men, told Boatright to "go wait in the truck" and told Darst that she

and Boatright were leaving. At that point, Darst "lost it" and "got very upset," yelling at his mother, "There is no way you're leaving with him. He's going to kill you." Darst also yelled, "I'm not ever going to hide again. I'm not a coward. Nobody is going to hurt my mom."[1]

As Darst continued to yell, McAdams saw Boatright inside the house with a gun, pointing it at her. McAdams next saw Darst holding a gun, and Darst's gun "went off":

> And I was like—I was looking at a gun pointing at me, my son saw it, and that— he pulled his, but the gun went off and it was like—it was way too high and way to the left. It—I mean, it wasn't—he didn't even get it pointed and it went off.

Boatright then shot Darst. McAdams described the sequence of events as follows:

> And so I was standing there and my son pulled a gun. He leaned forward and I saw his gun, and I thought no. And then [Darst] got it up, but not over, and it went off. The next fired shot was fired. At the time I did not know this, but it hit [Darst's] shoulder. . . . But [Darst] still didn't go down. I got in front and [Darst] was unarmed at this point, I was unarmed, and [Boatright] put a bullet in him.

On cross-examination, McAdams testified that there were four gunshots. According to McAdams, the first shot was from Darst's gun and the second, third, and fourth shots were from Boatright's gun. McAdams believed that the second shot hit Darst in the shoulder, causing him to drop his gun; the third shot missed Darst; and the fourth shot, which McAdams described as the "kill shot," hit Darst in the head.

At the time of his death, Darst had his cell phone on him, and the phone, which was discovered in Darst's pants pocket at the medical-examiner's office, audio-recorded the

---

[1] There was an "incident" between Boatright and McAdams, apparently involving domestic violence, that occurred approximately two days before the shooting, but in a hearing outside the presence of the jury, the district court instructed McAdams not to testify as to the circumstances of that incident.

shooting. A copy of that recording was admitted into evidence and played for the jury. At the beginning of the recording, Darst could be heard yelling at McAdams and accusing Boatright of various bad acts, including being a "wife beater" and putting a gun to Darst's head, and McAdams could be heard yelling back at Darst and attempting to calm him down. Then, Darst could be heard shouting, "You got a fucking gun?" Immediately thereafter, four gunshots could be heard in quick succession, followed by McAdams yelling at Boatright to get out of the house and then calling 911 to report that her son had been shot.

Deputy Nathan Neitsch of the Bastrop County Sheriff's Office was one of the first officers to arrive at the scene. When he arrived, another deputy was detaining Boatright outside. Deputy Neitsch went inside the residence and observed McAdams crying and Darst lying face down on the living-room floor, with a "pool of blood" beneath him. There was a firearm near McAdams's feet, a .45-caliber Springfield XDS, that was later determined to be the gun that Darst had fired during the incident. Neitsch also observed another firearm on the kitchen island counter, a .45-caliber SIG Sauer 1911, that was later determined to be the gun that Boatright had used to shoot Darst.

When EMS arrived at the scene, Darst was pronounced dead. An autopsy determined that Darst had two gunshot wounds, one to his right shoulder and one at the top of his nose. According to the autopsy report, the gunshots caused Darst's death, with the gunshot to the shoulder contributing to Darst's blood loss and the gunshot to the head delivering the fatal blow. Toxicology testing performed during the autopsy revealed that Darst had methamphetamine, amphetamine, and alcohol in his system at the time of his death, and his blood-alcohol level was .08 percent.

3

Following the shooting, Boatright and McAdams were interviewed by Officer Mark Garcia of the Bastrop County Sheriff's Office. Boatright told Garcia that Darst had been using drugs that day and was acting in a "threatening" manner. He admitted shooting Darst but claimed that he did so only after Darst had pointed his gun at him. McAdams told Garcia that Boatright had been waiting outside in the truck and came back inside the house when he heard McAdams and Darst arguing. McAdams denied that Boatright had pointed a gun at her. McAdams made another statement to police that when Boatright came through the door, he had his gun pointed at Darst.

Investigator Robert Carvin of the Bastrop County Sheriff's Office investigated the shooting. Carvin provided extensive testimony regarding the physical evidence in the case, including the location of the firearms, bullets, shell casings, and other evidence that was collected from the house. Carvin testified that Boatright's claim that he shot Darst in self-defense was "not consistent with what we found at the scene." Specifically, "the way the rounds were fired there," "the direction, the positioning of Nancy and Toby" in the house, and the locations where officers had found the bullets and bullet holes "didn't line up with" Boatright's account of the incident, while McAdams's account was "more in line with" the physical evidence obtained during the investigation.

The jury found Boatright guilty of murder. This appeal followed.

## STANDARD OF REVIEW

"Under the Due Process Clause, a criminal conviction must be based on legally sufficient evidence." *Harrell v. State*, 620 S.W.3d 910, 913 (Tex. Crim. App. 2021) (citing *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015)). "In assessing the sufficiency of

4

the evidence to support a criminal conviction, 'we consider all the evidence in the light most favorable to the verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the crime beyond a reasonable doubt.'" *Braughton v. State*, 569 S.W.3d 592, 607–08 (Tex. Crim. App. 2018) (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "When reviewing whether there is legally sufficient evidence to support a criminal conviction, the standard of review we apply is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Murray*, 457 S.W.3d at 448 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "On appeal, reviewing courts 'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Murray*, 457 S.W.3d at 448 (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App.2007)). "Thus, '[a]ppellate courts are not permitted to use a "divide and conquer" strategy for evaluating sufficiency of the evidence' because that approach does not consider the cumulative force of all the evidence." *Id*. (quoting *Hacker v. State*, 389 S.W.3d 860, 873 (Tex. Crim. App. 2013)). "When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination." *Id*. at 448–49 (citing *Hooper*, 214 S.W.3d at 12).

In a sufficiency challenge to the jury's rejection of a self-defense theory, our review focuses on the parties' respective burdens at trial: "the defendant bears the burden to

produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues." *Braughton*, 569 S.W.3d at 608 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *Saxton v. State*, 804 S.W.2d 910, 913-14 (Tex. Crim. App. 1991)). "The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue." *Id*. (citing *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013)). "By contrast, the State's burden of persuasion 'is not one that requires the production of evidence; rather it requires only that the State prove its case beyond a reasonable doubt.'" *Id*. (quoting *Zuliani*, 97 S.W.3d at 594). "Thus, '[i]n resolving the sufficiency of the evidence issue, we look not to whether the State presented evidence which refuted appellant's self-defense testimony, but rather we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of [the offense] beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt.'" *Id*. at 609 (quoting *Saxton*, 804 S.W.2d at 914). "When a jury finds the defendant guilty, there is an implicit finding against the defensive theory." *Zuliani*, 97 S.W.3d at 594.

Ultimately, "the issue of self-defense is an issue of fact to be determined by the jury," and "the legal sufficiency standard does not permit us to substitute our view of the credibility of the witness testimony for the jury's." *Braughton*, 569 S.W.3d at 609, 611. "A jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony." *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018). "Although the parties may disagree about the logical inferences that flow from undisputed facts, '[w]here there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.'" *Evans v. State*, 202 S.W.3d 158, 163 (Tex. Crim. App. 2006) (quoting *Anderson*

6

*v. City of Bessemer*, 470 U.S. 564, 574 (1985)). "However, juries are not permitted to come to conclusions based on 'mere speculation or factually unsupported inferences or presumptions.'" *Braughton*, 569 S.W.3d at 608 (quoting *Hooper*, 214 S.W.3d at 15-16).

## DISCUSSION

A person commits murder if he intentionally or knowingly causes the death of an individual. Tex. Penal Code § 19.02(b)(1). It is a defense to murder if the conduct that caused the death is justified. *See id*. § 6.02. "A person is justified in using deadly force against another when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force." *Id*. § 9.32(a)(2)(A). The use of deadly force against another is not justified if the actor provoked the other's use or attempted use of unlawful deadly force. *Id*. §§ 9.31(b)(4), 9.32(a)(1); *see also Smith v. State*, 965 S.W.2d 509, 512 (Tex. Crim. App. 1998) ("The rule of law is that if the defendant provoked another to make an attack on him, so that the defendant would have a pretext for killing the other under the guise of self-defense, the defendant forfeits his right of self-defense.").

In his sole issue on appeal, Boatright asserts that the evidence is insufficient to support the jury's implicit rejection of his theory that he shot Darst in self-defense. In arguing that he was justified in shooting Darst, Boatright focuses on the uncontroverted evidence that Darst fired his gun before Boatright fired his and that Darst, who was clearly infuriated at Boatright, had both methamphetamine and alcohol in his system at the time of the shooting. Thus, Boatright's theory is that Darst shot at him first in a drug-induced state of rage, and Boatright returned fire to defend himself from Darst.

Although there was evidence to support this theory of the case, there was also evidence to support the State's theory that Boatright was not acting in self-defense when he shot Darst. McAdams testified that when she saw Boatright, he had his gun pointed at her. Although she had earlier denied to police that Boatright had pointed his gun at her, the jury was free to believe her testimony on the witness stand. Moreover, Carvin testified that McAdams also had told the police that Boatright had pointed his gun at Darst. Whether Boatright pointed his gun at McAdams or Darst, the jury could have reasonably inferred that Boatright intended to shoot or at least threaten to shoot either one or both of them before Darst took out his gun. The shooting was preceded by Darst loudly and angrily accusing Boatright of committing various bad acts, including being a "wife beater," and the jury could have reasonably inferred that Darst's accusations angered Boatright, who, McAdams testified, was drunk and had been "antagonizing" Darst that day. On the audio recording of the shooting, immediately before the gunshots, Darst could be heard shouting, "You have a fucking gun?" The jury could have reasonably inferred from this evidence that Darst had seen Boatright pointing the gun in their direction and took out his gun in self-defense. McAdams testified that Darst "didn't even get it pointed and it went off," which the jury could have reasonably inferred meant that Darst was not aiming the gun at Boatright and that it accidentally discharged as he was handling it.

Additionally, although Darst fired one shot from his gun, which did not hit Boatright, Boatright fired three shots from his gun, two of which hit Darst, the first one to his shoulder and the second one to his head, which McAdams described as "the kill shot." The jury could have reasonably inferred from this evidence that Boatright intended to shoot Darst but that Darst did not intend to shoot Boatright. Further, Boatright provided a statement to police that, according to Investigator Carvin, was "not consistent" with the evidence at the crime scene.

8

Based on those inconsistencies, the jury could have chosen to disbelieve Boatright's claim that he had acted in self-defense and instead credited McAdams's account of the shooting, which Carvin testified was "more in line with" the physical evidence.

In summary, there were two eyewitness accounts of the shooting, one provided by McAdams that supported the State's theory of the case, and one provided by Boatright that supported his theory that he acted in self-defense. On this record, we cannot conclude that the jury's finding in favor of the State's theory is irrational or speculative. When the record supports conflicting inferences, as it does here, we are to "presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination." *Murray*, 457 S.W.3d at 448–49. Viewing the evidence summarized above in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Boatright murdered Darst and that he did not act in self-defense. *See Braughton*, 569 S.W.3d at 612–13; *Saxton*, 804 S.W.2d at 914.

We overrule Boatright's sole issue.

### CONCLUSION

We affirm the judgment of conviction.

_____

Gisela D. Triana, Justice

Before Chief Justice Byrne, Justices Triana and Smith

Affirmed

Filed:   August 30, 2022

Do Not Publish

9